IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MALCOM MAXWELL RYIDU-X #273-575,
  a/k/a RICHARD JANEY            :

          Plaintiff              :

          v.              :  CIVIL ACTION NO. WDQ-14-1735

MARYLAND DIVISION OF CORRECTION :
  CORRECTION
WESTERN CORRECTIONAL INSTITUTION:
JOHN DOE, INMATE COMMISSARY
  SUPERVISOR                  :
MARYLAND CORRECTIONAL
  INSTITUTION – HAGERSTOWN  :
LEE ANN CRAWFORD,[1] OFFICE
  SECRETARY II                :
MAUREEN REID, CASE MANAGEMENT
  SUPERVISOR                  :
JOHN DOE, KEEFE EMPLOYEE WHO
  PROCESSES INMATE REQUESTS  :
TONY UNKNOWN, INMATE
  COMMISSARY SUPERVISOR FOR  :
  MCI-H
KEEFE COMMISSARY NETWORK, LLC. :

          Defendants          :

**MEMORANDUM OPINION**

1.    **Procedural History**

On May 29, 2014, Malcom Maxwell Ryidu-X, a prisoner confined within the Maryland Division of Correction ("DOC"), filed the instant civil rights action pursuant to 42 U.S.C. § 1983. He seeks money damages and alleges that prison personnel ("the Correctional Defendants") and unidentified employees of Keefe Commissary Network, LLC ("Keefe"), the outside contractor

---

[1] The Clerk shall amend the docket to reflect the full and proper spelling of the Defendants' names, as reflected above.

charged with providing prison commissary services, have violated his right to equal protection[2] as well as his First and Eighth Amendment rights from "April 27, 2013 through this 28th day of May 2014," by denying him "access to inmate commissary services to purchase personal hygiene and stationery materials, etc." ECF No. 1 at 5-6, 9.

Counsel for Keefe has filed a Motion to Dismiss for Failure to State a Claim (ECF No. 19)[3] which is opposed by Ryidu-X. ECF No. 25. A Motion to Dismiss or, in the Alternative Motion for Summary Judgment filed on behalf of the Correctional Defendants (ECF No. 21),[4] construed as a summary judgment motion and opposed by Ryidu-X (ECF No. 27),[5] also remains pending. A hearing is not needed to resolve the issues presented in this case. *See* Local Rule 105.6 (D. Md. 2014).

2.   **Background**

Ryidu-X's latest civil rights action derives in pertinent part from an earlier action wherein Ryidu-X asserted that prison personnel at Jessup Correctional Institution ("JCI") violated his constitutional rights by denying commissary, mail order privileges, and access to prison records when he used his religious name. *See Malcom Maxwell Ryidu-X, a/k/a Richard Janey v. Wolfe, et al.*, Civil Action No. WDQ-11-358 (D. Md.). As noted therein, on February 23, 1998, Richard Edward Janey was sentenced to twenty-five years' incarceration in the Circuit

---

[2] The Correctional Defendants have not addressed Ryidu-X's equal protection claims. They shall be directed to do so in the Order accompanying this Memorandum Opinion.

[3] Individual Keefe employees "John Doe, Keefe employee who processes inmate requests" ("John Doe II") and "Tony Unknowns, Keefe Commissary Supervisor for MCI-H" were never identified and thus were not personally served with summons and the Complaint. Had they been identified and served, they would be entitled to dismissal, for reasons apparent herein.

[4] The Correctional Defendants include the Maryland Division of Correction, Western Correctional Institution, Maryland Correctional Institution-Hagerstown, Lee Ann Crawford and Maureen Reid. Defendant "John Doe, Inmate Commissary Supervisor" was not identified and thus not served. It is unclear whether this individual was a correctional employee or worked for Keefe.

[5] The opposition is also captioned as a Motion for Summary Judgment.

Court for Anne Arundel County in Criminal No. 02K950000498. Janey's subsequent petition in the Circuit Court for Baltimore City to change his name to "Malcom Maxwell Ryidu-x" was granted on October 28, 1999. *Id.*, ECF Nos. 25 and 36

Ryidu-X filed Civil Action No. WDQ-11-358, a self-represented civil rights action, against Warden John Wolfe and three supervisory corrections officers responsible for commissary and property supplies at JCI, the maximum security prison where Ryidu-x had been housed on administrative and/or disciplinary segregation status since his March 11, 2010 transfer from Western Correctional institution ("WCI"). The undersigned granted summary judgment to the Defendants, finding insufficient facts to squarely find a violation of constitutional magnitude with regard to Ryidu-X's First Amendment claim, and further found that Ryidu-X failed to establish actual harm based on his due process claim that he had been denied access to various prison records. Ryidu-X filed an appeal.

The United States Court of Appeals for the Fourth Circuit appointed counsel to represent Ryidu-X on appeal. On April 4, 2013, Ryidu-X, through counsel, entered into a settlement agreement with the appellees and the Maryland Department of Public Safety and Correctional Services ("DPSCS"), wherein:

> Within Fourteen (14) days of the execution of this Settlement Agreement, (a) Appellant Ryidu-X will be transferred to Eastern Correctional Institution (ECFI) or Western Correctional Institution (WCI) on either protective custody or administrative segregation status and will be held in a single cell; (b) Appellant Ryidu-X will be provided at no cost to him an identification card with his religious name, Malcom Maxwell Ryidu-X, on the front of the card; and (c) the Deputy Secretary will issue a memorandum order that states as follows:
>
>> Malcom Maxwell Ryidu-X, who was committed under the name Richard Edward Janey, has encountered problems accessing prison services, including commissary, mail orders and packages, and records, when using his

> legal/religious name: Malcom Maxwell Ryidu-X. Under DPSCS/DOC regulation, Mr. Ryidu-X is entitled to use his legal/religious name to access prison services. All DPSCS/DOC personnel are HEREBY ORDERED to take the necessary steps to comply with DPSCS/DOC regulation to ensure Mr. Ryidu-X's ability to access prison services using his legal/religious name. This order is mandatory.
>
> The order will be distributed directly to each of the following: two regional executive directors, two correctional directors, two wardens, the wardens' assistant wardens, the warden's security chief, and Appellant Ryidu-X's case manager. The security chiefs will give a copy of the order to the Captains who will ensure that it is promulgated to the security staff of the housing tier where Appellant Ryidu-X is housed. A copy of the order also will be given to Appellant Ryidu-X's counsel with the understanding that Appellant's counsel will give a copy to Appellant Ryidu-X. A copy of the order also will be placed in Appellant Ryidu-X's basefile.
>
> Within fifteen (15) days of the execution of this Settlement Agreement, the Deputy Secretary's Office will submit to Appellees' counsel a compliance report, showing the status of the terms mentioned in paragraph 1, above.

ECF No. 21-2 at 2-3. An order of voluntary dismissal of the appeal was subsequently granted, with the mandate issuing on April 25, 2013.

As reflected by the parties' submissions and exhibits in this latest action, implementation of the Settlement Agreement has not been seamless. Nonetheless, for reasons noted herein, the Court finds that Ryidu-X has not sustained a violation of his civil rights based on difficulties in obtaining access to prison commissary items.

3.   **Standard of Review**

To survive a Rule 12(b)(6) motion to dismiss, a Complaint must set forth "a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556. "In considering a

motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Keefe's Motion clearly is a Rule 12(b)(6) motion to dismiss.

The Correctional Defendants' motion, however, contains matters outside the pleading. When such matters "are presented to and not excluded by the court, the [12(b)(6)] motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998) (alteration in the original) (quoting Fed. R. Civ. P. 12(b)) (internal quotation marks omitted). Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970)). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48 (alteration in the original).

A "material fact" is one that might affect the outcome of a party's case. *Id.* at 248; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001) (citing *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect

5

the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *accord Hooven-Lewis*, 249 F.3d at 265.

"There are two requirements for a proper Rule 12(d) conversion." *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 281 (4th Cir. 2013). First, all parties must "be given some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment," which can be satisfied when a party is "aware that material outside the pleadings is before the court." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985); *see also Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (commenting that a court has no obligation "to notify parties of the obvious"). "[T]he second requirement for proper conversion of a Rule 12(b)(6) motion is that the parties first 'be afforded a reasonable opportunity for discovery.'" *Greater Baltimore*, 712 F.3d at 281.

Ryidu-X had adequate notice that the Correctional Defendants' motion might be treated as a motion for summary judgment.[6] The material attached to the motion itself provides sufficient indicia of conversion. *See Laughlin*, 149 F.3d at 260-61. Ryidu-X has not cited any additional evidence that would be helpful to the disposition of this case. Accordingly, the Correctional Defendants' motion shall be treated as a motion for summary judgment.

---

[6] Ryidu-X was served with notice of Defendants' filings pursuant to the requirements of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). See ECF Nos. 20 and 22.

4. **Defendant Keefe's Dispositive Motion**

Ryidu-X complains that Keefe employees have taken money from his prison account towards the purchase of various commissary items, often failed to provide the designated items,[7] then took "weeks (and often months)" to credit the funds back to his prison account.[8] ECF No. 1 at 5-8 and ECF No. 25-1 at 2. Specifically, Ryidu-X complains that following his transfer to MCI-H, Keefe personnel did not permit him to purchase personal hygiene and legal stationery using his religious name on January 3, 10, 17, 24 and 31, February 21 and 28, March 7, 14, 21 and 28, and April 10, 2014. ECF No. 27 at 5-7. Ryidu-X states that on May 16, 2014, he met with Keefe supervisor "Tony," who informed him that "this religious discrimination and persecution would continue until [Ryidu-X decided] to discontinue the use of his name." Ryidu-X states that Tony asked "What was your name before all this crap?" and then responded "use it!" *Id.* at 7.

Keefe does not contest these factual recitations, arguing instead that Ryidu-X's allegations do not state a cognizable claim against it as a matter of law. ECF No. 19 at 3. Keefe notes that it was not a signatory to the DOC's Settlement Agreement, and further notes that while

---

[7] Ryidu-X states generally that as a result of his inability to purchase hygiene items he was deprived "of the ability to wash himself or his clothing, etc. or to brush his teeth for months at a time," thus suffering "ACTUAL HARM." ECF No. 27 p. 15. The record does not support this statement, and does not show physical injury or illness or an inability to litigate based on the denial of commissary items. In prior litigation, Ryidu-X has consistently couched his allegations not as claims concerning denial of access to commissary items resulting in Eighth Amendment injury, but as violative of his First and Fourteenth Amendment rights. His current lawsuit finds support largely on the basis of the consent decree, based on Defendants' alleged continued failure to recognize his religious legal name when accessing commissary services and, in one instance, when attempting to obtain ARP forms. Ryidu-X admitted at his administrative hearing that WCI's initial failure to recognize the settlement agreement after his April 25, 2013 transfer from JCI resulted in a denial to commissary purchases for only a brief period, and was fully resolved by May 29, 2013. ECF No. 27-2 at 7. Ryidu-X apparently had additional problems once transferred from WCI to MCI-H; however, he again has failed to establish – through medical records or otherwise – "actual injury" as a result of his inability to obtain commissary items over that four month period.

[8] Ryidu-X's additional allegations concerning Keefe practices such as the sale of stale or spoiled foods, lack of food expiration dates, and sale of inoperable batteries, echoed by fellow prisoners who co-signed his Affidavit (ECF No. 25-1 at 2-3), were not raised in the original Complaint and will not be examined here.

7

individuals have a right to be free from state violations of constitutional guarantees, Keefe is a private – not a state -- actor.[9] *Id.*

At its core, a civil rights action under 42 U.S.C. § 1983 is directed to unlawful conduct under color of law. *See Owens v. Baltimore City State's Attorney Office*, 767 F.3d 379 (4th Cir. 2014). Section 1983 of 42 U.S.C. provides, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

Under 42 U.S.C. ' 1983, a defendant must be acting "under color of" state law to be held liable. In the instant matter there is no indication that Defendant Keefe, a private corporation/civilian contractor, acts in any way as a state entity. At most, Keefe and its employees are under contract with the State to provide commissary items to Maryland's prison population.[10] While Ryidu-X may seek reimbursement or take other action against Keefe in any appropriate State court, he may not proceed against the company or its employees under the Civil Rights Act. Keefe is entitled to dismissal from this action as a matter of law.

---

[9] Ryidu-X's ARP concerning his problems with Keefe personnel at MCI-H were rejected by the Warden because Keefe was a private contractor "outside the jurisdiction of DPSCS." ECF No. 1-5 at 3.

[10] While not bound by the Settlement Agreement, Keefe has been notified, both by the Warden and Assistant Warden of MCH-I (ECF No. 1-5 at 3 and ECF No. 27-5, Affidavit of Assistant Warden Keith L. Lyons, at ¶ 4), regarding its terms, which permit Ryidu-X to use his religious name for all purposes, including the purchase of commissary items.

5.  **The Correctional Defendants' Dispositive Motion**

In analyzing a § 1983 claim, a court must first identify "the specific constitutional right allegedly infringed." *Albright,* 510 U.S. at 271. Here, Ryidu-X alleges an Eighth Amendment violation (denial of commissary items, including hygiene items and writing material) and an access to courts violation (denial of an Administrative Remedy Procedure or "ARP" form). Both violations find their genesis in Ryidu-X's larger claim that Defendants are violating the First Amendment for refusing to recognize his religious name.[11]

Correctional Defendants Maryland Division of Correction, WCI and MCI-H seek dismissal on the ground that they are not entities subject to suit under 42 U.S.C. § 1983. Correctional Defendants Crawford and Reid seek dismissal based on a failure to complete administrative exhaustion[12] and, alternatively, seek summary judgment on the basis that they did not infringe on Ryidu-X's civil rights.

To sustain a § 1983 action, a plaintiff must allege injury by a "person" acting under color of state law. *See* 42 U.S.C. § 1983; *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 & n. 55 (1978) (noting that for purposes of § 1983 a "person" includes individuals and "bodies politic and corporate"); *see generally* Charles Alan Wright, et al., *Fed. Prac. & Proc.* § 1230 (2002). Several courts have held that inanimate objects such as buildings, facilities, and grounds do not act under color of state law. *See Allison v. Cal. Adult Auth.,* 419 F.2d 822, 823 (9th Cir. 1969) (California Adult Authority and San Quentin Prison not "person[s]" subject to suit under 42 U.S.C. § 1983); *Preval v. Reno,* 57 F.Supp.2d 307, 310 (E.D.Va. 1999) ("[T]he Piedmont

---

[11] Violation of the Settlement Agreement does not, in and of itself, present a cognizable constitutional claim to be examined in the context of this lawsuit.

[12] Because these Defendants are entitled to summary judgment, the Court need not examine their additional defense of qualified immunity.

Case 1:14-cv-01735-CCB   Document 31   Filed 07/06/15   Page 10 of 19

Regional Jail is not a 'person,' and therefore not amenable to suit under 42 U.S.C. § 1983."); *Brooks v. Pembroke City Jail*, 722 F.Supp. 1294, 1301 (E.D.N.C. 1989) ("Claims under § 1983 are directed at 'persons' and the jail is not a person amenable to suit."). For this reason, the Maryland Division of Correction, WCI and MCI-H are dismissed from suit.

Defendants Crawford and Reid argue that Ryidu-X failed to exhaust administrative remedies. The Prisoner Litigation Reform Act provides, in pertinent part:

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. ' 1997e.

As a prisoner, Ryidu-X is subject to the strict requirements of the exhaustion provision, even if he is aggrieved by a single occurrence, as opposed to a general conditions of confinement claim. *See Porter v. Nussle*, 534 U.S. 516, 528 (2002) (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure, *see Booth v. Churner*, 532 U.S. 731, 741 (2001), and a claim which has not been exhausted may not be considered by this Court. *See Jones v. Bock*, 549 U.S. 199, 220 (2007).

Administrative remedies must, however, be available to the prisoner and this Court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007). The Fourth Circuit has addressed the meaning of Aavailable@ remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See*

10

*Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies Ain accordance with the applicable procedural rules,@ so that prison officials have been given an opportunity to address the claims administratively. *Id.* at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

*Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008).

Thus, unless Ryidu-X can show that he has satisfied the administrative exhaustion requirement under the PLRA or that DOC officials have forfeited their right to raise non-exhaustion as a defense, Ryidu-X's allegations involving each instance wherein he was denied access to the commissary or an ARP form, as well as his overarching claim concerning the failure by prison personnel to recognize his name change following the execution of the Settlement Agreement, must be dismissed. *See Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003). The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase*, 286 F. Supp. 2d at 530; *Booth*, 532 U.S. at 735 (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F. 3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

Ryidu-X clearly pursued and completed administrative exhaustion with regard to the April 27, 2013 incident wherein WCI staff ordered him to use his birth name – not his

11

legal/religious name – in order to receive commissary services or to transfer funds within his prison account.[13] ECF No. 21-6 at 1-2. Furthermore, the parties agree that Ryidu-X was denied an ARP form on or about January 3, 2014; Ryidu-X claims this action is attributable to Defendants Reid and Crawford, and thwarted his ability to grieve the seizure of his ID card, issued in his religious name, which was seized as contraband upon his December 17, 2013 transfer from WCI to MCI-H. While Ryidu-X did not file an ARP concerning misconduct with regard to commissary access for most of the instances referenced in his pleadings, the April 27, 2013 incident that occurred at WCI is fully exhausted (see Administrative Law Judge decision, of March 4, 2014, ECF No. 21-3) and the Court deems exhaustion waived with regard to the incidents occurring at MCI-H between December 17, 2013 and January 3, 2014. Accordingly, these incidents shall be reviewed on the merits.

The April 27, 2013 Incident

On April 4, 2013, while housed at JCI, Ryidu-X entered into a Settlement Agreement wherein he would be transferred to either ECI or WCI and placed on protective custody status in a single cell. The Settlement Agreement further provided that the Deputy Secretary for DPSCS would issue a memorandum order recognizing Ryidu-X's legal/religious name change, and instruct DPSCS and DOC officials to comply with regulations permitting Ryidu-X to use the name to access prison services, including commissary, mail orders and packages, and records.

---

[13] Ryidu-X's claims that he also was unable to purchase personal hygiene and legal stationery items on January 10, 17, 24 and 31, February 21 and 28, and April 10, 2014 were not presented as ARP grievances, are unexhausted, and will not be examined here. He attempted to grieve the alleged March 7, 14, 21 and 28, 2014, misconduct of Keefe commissary personnel, but his initial ARP was rejected by MCI-H's Warden on the basis that the DOC lacked jurisdiction over Keefe, a private contractor. ECF No. 1-5 at 3. Thus, the exhaustion requirement is waived as to the March, 2014 actions of Keefe personnel who, as noted above, are nonetheless not liable under § 1983 for any harm their conduct may have caused. The Court further notes that Ryidu-X presents no information showing he experienced actual harm (such as illness due to a lack of personal hygiene or a court proceeding impacted by his inability to purchase "legal stationery") as a result of the denial of commissary purchases on these dates.

Prison officials were given 15 days from the date of signing to provide a compliance report concerning implementation of the terms of the Settlement Agreement.

On April 15, 2013, Ryidu-X was transferred from JCI to WCI. The findings of fact outlined by the ALJ concerning this incident, which are not refuted by the parties, indicate that the Deputy Secretary's memorandum order did not issue until April 11, 2013. The ALJ also found that the DOC acknowledged at the administrative hearing that WCI did not comply with the Deputy Secretary's order when staff required Ryidu-X to use his birth name to access commissary privileges on April 27, 2013. Apparently WCI staff moved to correct the problem once notified by DOC officials, and as Ryidu-X admitted at the administrative hearing, he was allowed to use his legal/religious name by May 16, 2013, and had no additional problems with WCI personnel after May 29, 2013. ECF No. 21-3 at 6-7.

The grievance appeal that led to the ALJ ruling was summarized by Ryidu-X as a complaint that "on or about April 27, 2013, WCI staff improperly required him to use his "given name" (Janey) instead of his "religious name" (Ryidu-X) to access inmate commissary services, in violation of a written order of Deputy Secretary J. Michael Stouffer, dated April 11, 2013." ECF No. 21-3 at 1. Although the appeal examined whether the actions of WCI staff violated Deputy Stouffer's order (and by inference the terms of the Settlement Agreement), the ALJ noted in his Proposed Decision that Ryidu-X implied "that the violation was a serious violation of his right to practice his religion" and that "being forced to use his given name, Janey, which is a 'slave' name in his religion, is a mortal sin." ECF No. 21-3 at 6. The ALJ went on to find that WCI staff failed to follow the Deputy Secretary's order, and that requiring Ryidu-X to use his given name to access commissary services "infringed on [his] right to practice his religion." *Id.*

The ALJ further found that Ryidu-X did not present any evidence that he suffered any physical damages or any actual damages, and awarded Ryidu-X nominal damages of $1.00. *Id.*

Ryidu-X's primary emphasis in federal court turns on his claim that Defendants have impermissibly interfered with his religious practices by failing to recognize his religious name. The Free Exercise Clause of the First Amendment, applicable to the states by virtue of the Fourteenth Amendment,[14] provides that "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. Const. Amend. I. Although a prisoner does not enjoy the full range of freedoms as those not incarcerated, state action violates a prisoner's constitutional rights if it burdens a religious right and is not reasonably related to a legitimate penological interest. *See Turner v. Safley*, 482 U.S. 78, 89 (1987); accord *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987).

Prisoners also enjoy religious protection under the Religious Land Use and Institutionalized Persons Act (RLUIPA), which states that:

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a) (2000). Under RLUIPA a "substantial burden" on the free exercise of religion is one that forces adherents of a religion to modify behavior, to violate beliefs, or to choose between forfeiting governmental benefits and abandoning a religious precept. *See Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006).

It is undisputed that prisoners retain the right to legal recognition of adopted religious names, and prison authorities may not condition services or benefits upon a prisoner's waiver of

---

[14] *See Employment Division v. Smith*, 494 U.S. 872, 876-77 (1990).

such First Amendment rights. *Barrett v. Virginia*, 689 F.2d 498, 503 (4th Cir. 1982); *see also Hakim v. Hicks*, 223 F.3d 1244 (11th Cir. 2000); *Ali v. Dixon*, 912 F.2d 86 (4th Cir. 1990). Indeed, as noted in *Ryidu-X v. Wolfe,* Civil Action No. WDQ-11-358 (D. Md.), Defendants do not quarrel with that position.[15]

In *Ryidu-X v. Wolfe,* this Court found that DOC written policy did not violate Ryidu-X's First Amendment interest in using his religious name to obtain an ID card and conduct personal business, including sending and receiving funds, posting and receiving mail, and purchasing commissary items. *Ryidu-X v. Wolfe,* Civil Action No. WDQ-11-358, ECF No. 36 at 5, Memorandum of January 31, 2012. In that case, the Court found that Ryidu-X suffered no constitutional impediment as a result of policies and directives that govern prison recognition of his adoption of a religious name. However, the Court found unresolved the issues of whether non-supervisor JCI prison personnel were aware of these policies yet regularly ignore them, improperly, denying Ryidu-x commissary, purchasing and mail privileges available to other prisoners with the same security classification, based solely on Ryidu-X's adoption of an Islamic name. *Id.* at 5-6. As is the case here, Ryidu-X's use of his Islamic name may have resulted in denial of commissary privileges and the return of purchases from approved outside vendors on several occasions, while at other times, packages clearly were received, as evidenced by Ryidu-X's signature. *Id.*, ECF No. 14, Exhibits 6 and 7. Sometimes, Ryidu-X was denied commissary or had packages rejected even though he provided both names on his request forms, and no

---

[15] In fact, in the earlier case, Civil Action No. WDQ-11-358, Defendants provided copies of a Division of Correction ("DOC") case management publication and the DOC's Request for Inmate Name Change paperwork that read together demonstrate that the DOC permits a prisoner to change his name even if the prisoner does not obtain a court order recognizing the name change. *Id.*, ECF No. 31, Exhibit 1 at 1-2. DOC documents suggested that the 1999 court order acknowledging Ryidu-x name change may have been a part of his prison file, as evidenced by his successful ARP grievance concerning his proper name filed during the time he was incarcerated at Western Correctional Institution ("WCI"). *Id.*, ECF No. 1, Exhibit C-1. The "WCI Meritorious ARP," attached as Exhibit C-2 in the prior case, references a June 26, 2009 response granting an ARP request and requiring WCI commissary personnel to recognize Ryidu-x's legal name change and allow him commissary privileges under that name.

explanation for the denial is apparent on the forms. *Id.*, ECF No. 1, Exhibit C-3. Nonetheless, this Court found nothing to suggest that the DOC's policies and directives governing recognition of Ryidu-X's religious name violated the First Amendment, and further found insufficient facts to squarely find a violation of constitutional magnitude by the named Defendants or actual injury resulting from misconduct committed by commissary and mailroom personnel. (ECF No. 36 at 56, Memorandum of January 31, 2012).

The April 27, 2013 incident appears to be "more of the same." The Settlement Agreement was signed on April 4, 2013, while Ryidu-X was housed at JCI. On April 11, 2013, the Deputy Secretary's Order was signed; on April 15, 2013, in compliance with the Settlement Agreement, Ryidu-X was transferred from JCI to WCI. On April 27, 2013, unidentified WCI staff ordered Ryidu-X to use his birth name (not his religious name) to access commissary services. The parties do not dispute the ALJ's findings that once WCI personnel were made aware of the Settlement Agreement, Ryidu-X was able to successfully submit his commissary request, and that WCI personnel presented no challenge to his commissary access after May 29, 2013.

In short, there is no evidence suggesting Ryidu-X's temporary inability to access the commissary using his religious name while at WCI was a deliberate attempt to violate his First Amendment rights under the Free Exercise Clause, RLUIPA, or the Settlement Agreement. At best, it appears the problem occurred because WCI officials failed to adequately and promptly train line workers and lower level supervisors with regard to their obligations under the Settlement Agreement. This failure is sloppy at best and at times borders on impermissible. On this record, however, there are insufficient facts to squarely find a violation of constitutional magnitude on the part of the named Defendants, and Ryidu-X can point to no actual injury

resulting from misconduct committed by commissary and mailroom personnel at WCI.[16] At most, WCI officials were negligent in failing to quickly educate their staff. Such negligence, however, is not actionable under § 1983.[17] Ryidu-X has failed to demonstrate that WCI employees violated his First and Eighth Amendment rights with regard to this incident.

<u>The December 13, 2013 – January 3, 2014 Incidents</u>

As noted by the ALJ, staff became aware of and compliant with the Settlement Agreement shortly after Ryidu-X's transfer to WCI. Unfortunately, Ryidu-X again experienced difficulty obtaining commissary services following his December 17, 2013 transfer from WCI to MCI-H. In his Complaint and Motion for Summary Judgment (ECF Nos. 1 and 27),[18] Ryidu-X claims that he has had problems with implementation and enforcement of the Settlement Agreement. He notes that "[i]mmediately upon his Dec[ember] 17, 2013 transfer from WCI to MCI-H," he was called before a classification review board, "browbeaten" with the Settlement Agreement, and "informed by Mr. Bandeff"[19] that "[a]ny agreement to allow inmates to use (religious names) does not apply to MCI-H," and therefore, "all prison services would be denied him . . unless and until he . . . discontinued the use of his name when attempting to communicate with or request the services of any department at MCI-H." ECF No. 1 at 6 and ECF No. 27 at 4. Ryidu-X claims his ID card issued in his religious name was seized as contraband, and his

---

[16] To the extent that Ryidu-X paid for packages that were never received and never received refunds for his purchases, he may avail himself of the State's small claims court to recoup his losses.

[17] Ryidu-X Complaint allegations that WCI Defendants acted to persecute and punish him for using his religious name (ECF No. 1 at 6) simply are not supported by the record.

[18] This motion also has been considered as an opposition response to the Defendants' dispositive motion. Ryidu-X's "Affidavit" (ECF No. 27 at 17), stating that he has been harassed in August and September of 2014 by MCI-H correctional officers, is not properly before the Court and will not be addressed here.

[19] Bandeff is not named a Defendant in this case.

January 3, 2014 attempt to file an ARP concerning this incident was denied by Defendants Reid and Crawford, who refused to accept the form signed using his religious name.[20] *Id.* at 5.

As was the case at WCI, once MCI-H officials learned that Ryidu-X's request for an ARP form had been denied and his ID card confiscated, they acted quickly to notify their staff of the Settlement Agreement. The Declaration of Ronald B. Brezler, MCI-H's Security Chief outlines that he received a telephone call from Assistant Attorney General Stephanie Lane-Weber advising that she had been informed by Ryidu-X's attorney that ARP Coordinator Reid was not accepting his ARPs filed under his religious name. Brezler advised Reid that as a result of a court settlement, all ARPs filed by Ryidu-X were to be processed using his religious name. Similarly, when Brezler learned on January 7, 2014, that Ryidu-X's ID card had been confiscated, Brezler contacted the ID officers who promptly provided Ryidu-X with a new ID with his religious name on the front and the name under which he was incarcerated on the back. Two days later, Brezler sent an e-mail to all MCI-H supervisors advising them that pursuant to the Settlement Agreement, all departments and services "shall recognize and accept requests from Malcom Maxwell Ryidu-X #273575 even though his committed name is Richard Janey in OBSCIS." ECF No. 21-4 at 1, 3.

As occurred at WCI, no evidence suggesting Ryidu-X's brief inability to obtain and file an ARP request or the temporary seizure of his ID card resulted in an actual injury. Defendants' actions were in compliance with directives applicable to all prisoners. Nothing suggests Defendants were aware of the Settlement Agreement that exempted Ryidu-X from those directives. Brezler, the Security Chief then acting as assistant warden, remedied the short-lived

---

[20] Problems with commissary purchases (and delays in refunding monies for purchases never delivered) allegedly continued to occur through May of 2014. *Id.* at 6. Because Ryidu-X did not attempt to exhaust administrative remedies with regard to incidents occurring on January 10, 17, 24 and 31, February 21 and 28, and April 10, 2014, these incidents will not be examined here.

problem by educating correctional staff as to the existence (and terms) of the Settlement Agreement.

Defendants Keefe, Maryland Division of Correction, Western Correctional Institution, Maryland Correctional Institution-Hagerstown, "John Doe" and "Tony Unknown" shall be dismissed, and the remaining Correctional Defendants, Crawford and Reid, are granted summary judgment with regard to Ryidu-X's claims that his First and Eighth Amendment rights were violated. This determination, however, does not end this lawsuit. Ryidu-X also argues that the Correctional Defendants violated his right to equal protection "by allowing their civilian contractors to discriminate" against him by denying him access afforded to prisoners who requested commissary services under their Christian names. ECF No. 1 at 6. Once Ryidu-X provides supplemental information naming the WCI and MCI-H employees allegedly responsible for monitoring Keefe compliance regarding the delivery of commissary services, counsel for Correctional Defendants shall respond, as set forth in the accompanying Order which follows.

7/6/15
(Date)

William D. Quarles, Jr.
United States District Judge